UNITED STATES of America,
Plaintiff–Appellee,

v.

Marcus CANADY, Defendant–Appellant.

No. 2003, Docket 96–2402.

United States Court of Appeals,
Second Circuit.

Argued May 21, 1997.

Decided Sept. 24, 1997.

354

Edward S. Zas, Henriette D. Hoffman, Legal Aid Society, Federal Defender Division, New York City, for Defendant–Appellant.

Christopher V. Taffe, Assistant United States Attorney, Western District of New York, Rochester, NY (Patrick H. NeMoyer, United States Attorney, Western District of New York, Rochester, NY), for Plaintiff–Appellee.

Before: WALKER, McLAUGHLIN and PARKER, Circuit Judges.

JOHN M. WALKER, Jr., Circuit Judge:

Marcus Canady appeals from an order of the United States District Court for the Western District of New York (David G. Larimer, *District Judge* ) that denied his 28 U.S.C. § 2255 motion to vacate his conviction. On appeal, Canady raises two challenges to his conviction: (1) the evidence was insufficient to sustain Canady's conviction on the firearm count; and (2) at the conclusion of the non-jury trial, the district court's failure to announce its verdict in open court violated Canady's right to be present at all stages of trial in violation of Fed.R.Crim.P. 43(a) and the Fifth and Sixth Amendments.

We affirm in part, reverse in part, and vacate and remand for proceedings not inconsistent with this opinion.

## BACKGROUND

At 8:52 a.m. on March 27, 1993, Rochester Police Officer Joseph McClaney was dispatched to investigate a burglary call. When he arrived at the designated address in Rochester, New York, the officer recognized one of the two men sitting on the porch as Marcus Canady, whom he had known for about six years, but was unable to identify the other man.

As Officer McClaney approached, Canady explained that he was renovating the house for his uncle. Canady invited Officer McClaney inside and the two entered the house.

There were only two items of furniture in the entire house, a loveseat and a television set—both in the living room. A jacket lay on the right cushion of the loveseat, and the television was on. Officer McClaney saw no signs of renovation activity and noticed no tools.

Once the two were inside, Canady told the officer that he was going to call his uncle who would verify his purpose for being at the house and asked the officer to wait in the living room. Officer McClaney was soon joined by two other officers in the living room, waiting for Canady to return.

After a few minutes, Canady rejoined them, stating that his uncle was on his way. Canady sat on the left cushion of the loveseat about five feet away from where Officer McClaney was standing. Shortly thereafter, Canady repositioned himself on the loveseat's

left arm, and when he did, Officer McClaney noticed the barrel of a gun underneath the left cushion, pointed in his direction. Canady's left leg was inches away from the gun.

As a diversion, Officer McClaney asked Canady whether the jacket on the right cushion of the loveseat was his. As Canady looked over to the jacket, Officer McClaney grabbed the gun from underneath the left cushion. Canady then stood and Officer McClaney noticed a second gun beneath the left cushion. Both guns were accessible to someone seated on the loveseat simply by reaching down between the cushion and the arm of the loveseat. Canady was then arrested.

A search following Canady's arrest revealed a plastic bag containing nine smaller bags of cocaine, later determined to weigh 59.75 grams, wedged between the loveseat's right cushion and right arm. No identifiable fingerprints were found on the package, but a latent fingerprint lifted from one of the guns matched Canady's. Some rubberbands and a pager were also found at the foot of the loveseat. During the forty-five minutes that Officer McClaney was at the residence, Canady's uncle never arrived.

While in custody, Canady was interviewed by Rochester Police Investigator Dale Feor. Officer Feor asked Canady whether the guns and drugs found in the residence belonged to Canady. At first, Canady denied ownership, but after Officer Feor told Canady that one of his fingerprints had been matched to a latent fingerprint lifted from one of the guns, Canady admitted ownership of that gun. Canady continued to deny that he owned the other gun and the cocaine. Canady also stated that the house belonged to his aunt, and a key to the residence was found in his possession.

An indictment was subsequently returned, charging Canady with one count of possession with intent to distribute cocaine in violation of 21 U.S.C. § 841(a)(1) ("Count One") and one count of using and carrying a firearm during and in relation to a narcotics crime in violation of 18 U.S.C. § 924(c) ("Count Two"). On January 24, 1994, Canady waived his right to a jury trial and, that same day, a bench trial commenced and con-

cluded before Judge Larimer. The district court did not reconvene to announce its decision; and instead, on February 2, 1994, it mailed its decision and order convicting Canady on both counts to the parties. Canady first learned that he had been convicted two weeks later by reading a newspaper.

On May 5, 1994, the district court sentenced Canady to 41 months of imprisonment on Count One and 60 months of imprisonment on Count Two to be served consecutively, and to five years supervised release on Count One and two years supervised release on Count Two to be served concurrently. Canady did not object at sentencing to the court's failure to render its decision on guilt pursuant to Fed.R.Crim.P. 23(c) in open court.

On direct appeal, Canady's lawyer filed a brief challenging the conviction on the basis that the evidence was insufficient to establish that Canady constructively possessed the cocaine and the firearm. Canady moved for leave to file a supplemental brief *pro se*. In his motion papers, Canady indicated his desire to raise, on direct appeal, two additional challenges to his conviction: (1) that the district court erred by failing to announce the verdict in open court and (2) that the evidence did not show that Canady "used the firearm to facilitate" the narcotics offense. Because Canady was represented by counsel at the time, the Clerk's Office for the Second Circuit forwarded Canady's motion to his lawyer along with a letter asking the lawyer to reply to Canady's motion. Canady contends that his lawyer promised to raise the two additional issues on direct appeal; the lawyer failed to respond to this court's letter and did not argue the additional grounds urged by Canady. On February 15, 1995, a panel of this court affirmed the conviction, finding sufficient evidence to sustain Canady's conviction on both counts.

On October 2, 1995, Canady filed a 28 U.S.C. § 2255 motion *pro se* to vacate his conviction on the two grounds he had tried to raise on direct appeal in his *pro se* motion, and on the further ground that his counsel had been ineffective. Despite Canady's counsel's failure to raise the first two chal-

·lenges on direct appeal, or to object at sentencing to the court's mailing of its Rule 23(c) findings, the government did not assert a defense of procedural default in the district court. On December 5, 1995, the Supreme Court decided *Bailey v. United States,* —— U.S. ——, ——, 116 S.Ct. 501, 508, 133 L.Ed.2d 472 (1995) which held that a conviction for violating the "use" prong of 18 U.S.C. § 924(c) can be sustained only if the evidence shows that the weapon was "active[ly] employ[ed]." On March 19, 1996, the district court denied Canady's § 2255 motion. *United States v. Canady,* 920 F.Supp. 402, 408 (W.D.N.Y.1996). The district court concluded that (1) although his conviction could not be sustained under the "use" prong of § 924(c), the evidence established that Canady had "carried" the firearm during and in relation to a drug offense, *id.* at 406–07; and (2) under Fed.R.Crim.P. 43(a), Canady had no right to have his verdict announced in open court, *id.* at 404, and that the defendant's presence would have been useless, *id.* at 404–05. The district court also held that since the two grounds that counsel failed to raise lacked merit, there was no prejudice from counsel's conduct within the meaning of *Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984), and therefore the ineffective assistance claim must fail as well. 920 F.Supp. at 408. This appeal followed.

## DISCUSSION

### I. *18 U.S.C. § 924(c)*

Canady was convicted for violation of 18 U.S.C. § 924(c) which, in relevant part, imposes a five year prison term on a person who "during and in relation to any ... drug trafficking crime ... uses or carries a firearm." In order to convict under § 924(c), the government must show first, that the defendant used or carried a firearm and second, that the use or carrying was in relation to a drug trafficking crime. *See Smith v. United States,* 508 U.S. 223, 227–28, 113

**1.** Collateral relief under § 2255 is appropriate when there has been an intervening change in the substantive criminal law that establishes that the petitioner's conviction is based on conduct which is no longer regarded as criminal. *See Davis v. United States,* 417 U.S. 333, 345–47, 94

S.Ct. 2050, 2053–54, 124 L.Ed.2d 138 (1993). On his collateral appeal, Canady claims that the evidence was insufficient to convict him of the firearms count. We disagree.

■ "In challenging the sufficiency of the evidence to support his conviction, a defendant bears a heavy burden." *United States v. Giraldo,* 80 F.3d 667, 673 (2d Cir.1996), *cert. denied,* —— U.S. ——, 117 S.Ct. 135, 136 L.Ed.2d 83 (1996). In reviewing such a challenge, we "review evidence presented at trial in the light most favorable to the government." *United States v. Baker,* 78 F.3d 1241, 1245 (7th Cir.1996), *cert. denied,* —— U.S. ——, 117 S.Ct. 1720, 137 L.Ed.2d 842 (1997); *see United States v. Pimentel,* 83 F.3d 55, 57 (2d Cir.1996). We draw all inferences and resolve all issues of credibility in the government's favor. *See, e.g., United States v. Weiss,* 930 F.2d 185, 191 (2d Cir. 1991). We review the pieces of evidence as a whole, "not in isolation," *United States v. Podlog,* 35 F.3d 699, 705 (2d Cir.1994), *cert. denied,* 513 U.S. 1135, 115 S.Ct. 954, 130 L.Ed.2d 897 (1995); and we must affirm the conviction so long as, from the inferences reasonably drawn, the fact finder might fairly have found guilt beyond a reasonable doubt, *see United States v. Buck,* 804 F.2d 239, 242 (2d Cir.1986); *United States v. Taylor,* 464 F.2d 240, 244–45 (2d Cir.1972). These principles apply whether the evidence being reviewed is direct or circumstantial. *See Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 469–70, 86 L.Ed. 680 (1942); *Giraldo,* 80 F.3d at 673.

### A. *"Use" Under 18 U.S.C. § 924(c)*

■ In this case, the government concedes that, under the standard announced by the Supreme Court in *Bailey v. United States,* —— U.S. ——, 116 S.Ct. 501, 133 L.Ed.2d 472 (1995), decided after Canady's conviction,[1] the evidence in this case is insufficient to support a conviction under the "use" prong of § 924(c). Despite the govern-

S.Ct. 2298, 2304–06, 41 L.Ed.2d 109 (1974); *see, e.g., Ianniello v. United States,* 10 F.3d 59 (2d Cir.1993). Because the decision in *Bailey* marks such a change, it is properly applied retroactively.

ment's concession, this court must examine for itself whether the evidence supports a conviction under the "use" prong of § 924(c) after *Bailey.* *See United States v. Melendez,* 90 F.3d 18, 21 (2d Cir.1996) (per curiam), *cert. denied,* —— U.S. ——, 116 S.Ct. 1020, 134 L.Ed.2d 99 (1996); *United States v. Vasquez,* 85 F.3d 59, 60 (2d Cir.1996). Upon doing so, however, we agree with the government that the evidence of "use" was insufficient.

In *Bailey,* the Court held that to convict a defendant of "using" a weapon in connection with a drug offense under 18 U.S.C. § 924(c)(1), the government must show that the defendant "active[ly] employ[ed]" the firearm. Such active employment of a firearm includes "brandishing, displaying, bartering, striking with, and most obviously, firing or attempting to fire, a firearm." —— U.S. at ——, 116 S.Ct. at 508. The Court held that a conviction under § 924(c) could not be predicated on a theory of possession alone or even a theory of proximity and accessibility of the firearm in relation to the drugs. —— U.S. at —— – ——, 116 S.Ct. at 507–08. Thus, "the inert presence of a firearm, without more, is not enough to trigger" the use prong of § 924(c). *Id.* at ——, 116 S.Ct. at 508.

The direct evidence in this case was only that the firearm was stored in the loveseat. Neither this evidence, nor any inference reasonably following from it, establishes that the firearm was ever actively employed during and in relation to a drug trafficking crime. Thus, we agree with the government that the evidence was insufficient to sustain the conviction for "use." *See, e.g., United States v. Bermudez,* 82 F.3d 548, 550 (2d Cir.1996) (per curiam).

B. *"Carry" Under 18 U.S.C. § 924(c)*

■ The government, nonetheless, argues that Canady's conviction on Count Two can be sustained under the "carry" prong because, although the Supreme Court in *Bai-*

*ley* rejected the theory that proximity to and accessibility of a firearm can be the bases for a conviction under the "use" prong of § 924(c), that theory can support a conviction for "carrying" a firearm in violation of the statute.[2]

■ We agree with the government that proximity to and accessibility of a firearm are necessary elements of "carrying" a firearm in violation of § 924(c). *See, e.g., United States v. Feliz–Cordero,* 859 F.2d 250, 253 (2d Cir. 1988) ("carry" requires "at least a showing that the gun is within reach during the commission of the drug offense"); *United States v. Cruz–Rojas,* 101 F.3d 283, 286 (2d Cir. 1996) ("carry" not satisfied where evidence did not show that gun was accessible to either defendant); *Giraldo,* 80 F.3d at 676 (same). However, we do not agree that they are sufficient. *See United States v. Spring,* 80 F.3d 1450, 1464 (10th Cir.) ("*Bailey* suggests that neither storage nor possession of a gun, without more, satisfies the 'carry' prong of § 924(c)(1)."), *cert. denied,* —— U.S. ——, 117 S.Ct. 385, 136 L.Ed.2d 302 (1996); *United States v. Windom,* 82 F.3d 742, 749 (7th Cir.1996) ("carry" requires more than mere availability of gun), *cert. denied,* —— U.S. ——, 117 S.Ct. 1716, 137 L.Ed.2d 839 (1997); *United States v. Moore,* 76 F.3d 111, 113 (6th Cir.1996) (availability of weapon is necessary but not sufficient condition for conviction under "carry" prong of § 924(c)); *United States v. Morris,* 977 F.2d 617, 621 (D.C.Cir. 1992) ("Mere possession of a gun even by a drug trafficker does not violate [§ 924(c) ].").

Since "[n]either the legislative history of section 924(c)(1) nor case law in this circuit suggest that the term 'carry' should be construed as having any meaning beyond its literal meaning," *Feliz–Cordero,* 859 F.2d at 254, we look toward its natural and ordinary meaning. *Cf. Bailey,* —— U.S. at ——, 116 S.Ct. at 506.

Webster's Third New International Dictionary (1981) defines "carry" in relevant part

---

2. Although Count Two of the indictment charges that Canady "use[d] *and* carr[ied]" the gun, Canady "could properly be convicted under § 924(c) if ... [he] either used or carried a firearm" in connection with the underlying drug trafficking crime. *Giraldo,* 80 F.3d at 674. *See* *generally United States v. Schiff,* 801 F.2d 108, 114 (2d Cir.1986) (indictments worded in the conjunctive, charging violations of statutes that are worded in the disjunctive, can be supported by proof of either of the means of violating the act).

as "to move while supporting (as in a vehicle or in one's hands or arms): move an appreciable distance without dragging: sustain as a burden or load and bring along to another place ... to hold, wear, or have upon one's person." *See also* Webster's New Collegiate Dictionary (1976) ("to move while supporting," "transport," "capture," and "to bear upon or within one"); Black's Law Dictionary 194 (5th ed. 1979) ("Carry arms or weapons. To wear, bear, or carry them upon the person or in clothing or in a pocket. ...").

Both common sense and dictionary definitions indicate that the word "carry" implies either that an object is borne on the person or that the object is supported and moved from one place to another.

*Rodriguez v. United States,* Nos. 96 Civ. 3647, 91 CR. 85, 1996 WL 671172, at *2 (S.D.N.Y. Nov. 19, 1996); *see also Spring,* 80 F.3d at 1465.

■ While constructive possession based on the proximity of the defendant to a firearm may be a basis for conviction of the "use" prong so long as there is some active employment of the firearm, *Bailey,* —— U.S. at ——, 116 S.Ct. at 508 ("[T]he silent but obvious and forceful presence of a gun on a table can be a 'use.'"), it is not, without more, sufficient to convict for "carrying." Had Congress intended to punish simple possession, it would have done so. *See id.* at ——, 116 S.Ct. at 506; *cf.* 18 U.S.C. §§ 922(g), 922(j), 922(k), 922(o)(1), 930(a), 930(b).

■ We, therefore, reject the government's contention that proximity to or accessibility of a weapon alone is enough to satisfy the "carry" requirement of § 924(c). Instead, to uphold Canady's conviction for "carrying," the evidence must establish that, during and in relation to the drug trafficking crime, Canady either (1) had physical possession of the firearm, as distinct from constructive possession, *see, e.g., United States v. Santos,* 95 F.3d 116, 118 (2d Cir.1996) (per curiam) (upholding conviction for "carrying" where evidence showed that defendant actually held firearm in one hand, while completing a drug deal on the phone); *cf. Windom,* 82 F.3d at 749 (noting that "carry" require-

ment satisfied if jury concludes that defendant who was hunched beneath car seat under which a gun and drugs were found was attempting to secret the weapon); *United States v. Blount,* 98 F.3d 1489, 1494 & n. 9 (5th Cir.1996) (holding that "carry" requirement was not satisfied even though defendant's fingerprint was found on firearm located on top of a six foot television stand in living room and package of cocaine was found in closet of same home), *reh'g en banc granted,* 104 F.3d 58 (5th Cir.1997), or (2) moved the firearm from one place to another, *see, e.g., Giraldo,* 80 F.3d at 677 (gun transported in defendant's car during narcotics transaction); *United States v. White,* 81 F.3d 80, 83–84 (8th Cir.1996) (defendant dropped magazine clip during police chase following narcotics offense); *United States v. Ramirez–Ferrer,* 82 F.3d 1149, 1154 (1st Cir.) (gun and narcotics transported on defendant's boat), *cert. denied,* —— U.S. ——, 117 S.Ct. 405, 136 L.Ed.2d 319 (1996); *United States v. Manning,* 79 F.3d 212, 216–17 (1st Cir.1996) (gun transported in defendant's briefcase along with cocaine); *Baker,* 78 F.3d at 1247 (gun transported in defendant's car), *cert. denied,* —— U.S. ——, 117 S.Ct. 147, 136 L.Ed.2d 93 (1996).

Although direct evidence that Canady held or moved the gun during the underlying drug trafficking crime is absent, the evidence goes beyond simply showing that Canady was in close proximity to the firearm in the loveseat; it establishes additionally that Canady actually bore it on his person. Canady's fingerprint was found on the gun hidden in the same loveseat as a package of cocaine and near a pager and rubberbands. There was testimony that drug dealers often use pagers. Canady was also in possession of the keys to the house. He admitted that he owned the firearm which bore his fingerprint. Viewed in the light most favorable to the government, the evidence supports a reasonable inference that Canady transported the gun when he stored it together with the cocaine in the loveseat. This evidence is sufficient to uphold a conviction for carrying under § 924(c).

Therefore, we affirm the conviction under the "carry" requirement because, viewed in

the light most favorable to the government, the evidence was sufficient to establish that Canady actually held the firearm during and in relation to a drug trafficking crime.

## II. Announcement of the Verdict

On appeal, Canady also argues that the district court's failure to announce its decision in open court violated Fed.R.Crim.P. 43(a) and the Fifth and Sixth Amendments. At trial, after both sides rested and completed their summations, the district court, addressing Canady directly, stated:

> I will reserve.... I intend to write a decision on the matter, setting forth my findings and conclusions. I hope to do that promptly.... Mr. Canady, the Court has considered the proof carefully. I want to consider the cases submitted by you and your lawyer, and I will get a decision to you and your lawyer as soon as I can.

The district court did not reconvene to announce the verdict; instead, the district court mailed its decision and order convicting Canady on both counts to the parties. Canady first learned that he had been convicted two weeks later by reading a newspaper.

### A. Waiver

■ The government contends, for the first time on appeal, that Canady waived this argument by failing to object to what the government characterizes as the district court's announced intent to reserve decision and issue a written decision without reconvening the parties to announce the verdict.

■ "A waiver of a constitutional right must be voluntary, knowing and intelligent, that is, the act of waiver must be shown to have been done with awareness of its consequences." *United States v. Morgan,* 51 F.3d 1105, 1110 (2d Cir.), *cert. denied,* —— U.S. ——, 116 S.Ct. 171, 133 L.Ed.2d 112 (1995); *see Johnson v. Zerbst,* 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461 (1938); *see, e.g., United States v. Gagnon,* 470 U.S. 522, 529, 105 S.Ct. 1482, 1485–86, 84 L.Ed.2d 486 (1985) (per curiam); *United States v. Rosario,* 111 F.3d 293, 299 (2d Cir.1997), *petition for cert. filed,* (July 14, 1997) (No. 97–5196); *Polizzi v. United*

*States,* 926 F.2d 1311, 1319 (2d Cir.1991). In examining a purported waiver of the right to a public trial, we draw all reasonable presumptions against the loss of such a right. *See Morgan,* 51 F.3d at 1110. It must appear clear from the record that the defendant voluntarily and knowingly waived his right to be present. *See United States v. Sanchez,* 790 F.2d 245, 249 (2d Cir.1986). In this case, the government claims that because Canady failed to object to the district court's statement that it intended to mail the verdict, Canady waived his public trial right. We disagree.

The district court's statement following summations, to the effect that it would promptly write a decision on the matter and that it considered the matter submitted by Canady, was not sufficient to give Canady notice of the district court's intent to mail its verdict or that the verdict would not be delivered to him in open court. The statement was fully consistent with the notion that the district court would reconvene to announce its verdict. Therefore, the government's argument that Canady waived his right to assert this argument must fail. The government does not now argue, and has never argued, that Canady waived his right to claim denial of his public trial right or his right to be present by failing to raise the issue at his subsequent sentencing, at which time the court could have restated its decision in open court. We decline therefore to consider this point.

■ Even if we were to construe the government's argument as one that Canady has "forfeited" (as opposed to "waived") the verdict announcement issue by failing to raise it on direct appeal, the government did not raise this procedural default argument in the district court and therefore, the government has waived the defense.

■ Ordinarily, the failure of a federal defendant to raise an issue on direct appeal will bar the defendant from raising the issue for the first time in a habeas petition unless the defendant can show "cause and actual prejudice." *Reed v. Farley,* 512 U.S. 339, 355, 114 S.Ct. 2291, 2300, 129 L.Ed.2d 277 (1994); *United States v. Frady,* 456 U.S. 152,

167–68, 102 S.Ct. 1584, 1594–95, 71 L.Ed.2d 816 (1982). However, because the government failed to raise its procedural default defense in the district court, it is precluded from doing so now. *See, e.g., United States v. Quiroz,* 22 F.3d 489, 491 (2d Cir.1994) (per curiam) (absent a showing of "manifest injustice," government cannot raise, for the first time on petition for rehearing, the procedural default defense); *Shukwit v. United States,* 973 F.2d 903, 904 (11th Cir.1992) (per curiam) (same); *Hansen v. United States,* 956 F.2d 245, 247 (11th Cir.1992) (same). *See generally,* James S. Liebman & Randy Hertz, *Federal Habeas Corpus Practice & Procedure* § 41.7b ("As in state prisoner habeas corpus proceedings, the government's failure to assert a procedural bar in a timely and forthright fashion ordinarily will be deemed a waiver of the procedural defense."). We, therefore, decline to consider the procedural default defense.

### B. *Failure to Announce Verdict in Open Court in Defendant's Presence*

Canady argues that the district court's deliberate decision to mail its decision to the parties rather than reconvene the proceedings to announce its verdict in open court violated both his right to be present at all stages of his trial and his right to a public trial. We agree.

■ We review the decision of a district court as to matters of law *de novo. See United States v. Santiago,* 977 F.2d 517, 521 (10th Cir.1992) (reviewing question of whether a defendant has the right to be present at a particular stage of trial is an issue of law subject to *de novo* review); *Larson v. Tansy,* 911 F.2d 392, 394 (10th Cir.1990) (same).

### 1. *Right to Be Present*

■ "A leading principle that pervades the entire law of criminal procedure is that, after indictment found, nothing shall be done in the absence of the prisoner." *Lewis v. United States,* 146 U.S. 370, 372, 13 S.Ct. 136, 137, 36 L.Ed. 1011 (1892); *see Rushen v. Spain,* 464 U.S. 114, 117–18, 104 S.Ct. 453, 455, 78 L.Ed.2d 267 (1983) (per curiam) (right to personal presence at all critical stages of the trial is a "fundamental right[ ]

of each criminal defendant"); *Diaz v. United States,* 223 U.S. 442, 456, 32 S.Ct. 250, 254, 56 L.Ed. 500 (1912) ("It is the right of the defendant in cases of felony ... to be present at all stages of the trial,—especially at the rendition of the verdict ....") (internal quotation marks omitted). The defendant's right to be present at every stage of trial is "scarcely less important to the accused than the right of trial itself," *id.* at 455, 32 S.Ct. at 254, and is rooted in both the Sixth Amendment Confrontation Clause, *see Illinois v. Allen,* 397 U.S. 337, 338, 90 S.Ct. 1057, 1058, 25 L.Ed.2d 353 (1970) ("One of the most basic of the rights guaranteed by the Confrontation Clause is the accused's right to be present in the courtroom at every stage of his trial."); *Arizona v. Levato,* 186 Ariz. 441, 924 P.2d 445, 448 (1996) (in banc) (recognizing Sixth Amendment guarantee to be "physically present for the return of jury verdicts" absent exceptional circumstances), and the Fifth Amendment Due Process Clause, *see Kentucky v. Stincer,* 482 U.S. 730, 745, 107 S.Ct. 2658, 2667, 96 L.Ed.2d 631 (1987); *Snyder v. Massachusetts,* 291 U.S. 97, 107–108, 54 S.Ct. 330, 332–33, 78 L.Ed. 674 (1934); *Hopt v. Utah,* 110 U.S. 574, 579, 4 S.Ct. 202, 205, 28 L.Ed. 262 (1884) ("If [a defendant] be deprived of his life or liberty without being ... present, such deprivation would be without that due process of law required by the constitution.").

■ The right extends to all stages of trial, *see Gagnon,* 470 U.S. at 526, 105 S.Ct. at 1484; *United States v. Mackey,* 915 F.2d 69, 72 (2d Cir.1990); *United States v. Reiter,* 897 F.2d 639, 642 (2d Cir.1990), including the return of the verdict, *see Rogers v. United States,* 422 U.S. 35, 38–39, 95 S.Ct. 2091, 2094–95, 45 L.Ed.2d 1 (1975), "to the extent that a fair and just hearing would be thwarted by [the defendant's] absence," *Snyder,* 291 U.S. at 108, 54 S.Ct. at 333.

The constitutional right has been codified in Fed.R.Crim.P. 43(a), *Rosario,* 111 F.3d at 298, which provides:

The defendant shall be present at the arraignment, at the time of the plea, at every stage of the trial including the impaneling of the jury and the return of the verdict,

and at the imposition of sentence, except as otherwise provided by this rule.

The government contends that the district court's failure to reconvene the parties to announce its decision in open court was not error at all, arguing that (1) the word "verdict" in Fed.R.Crim.P. 43(a) does not encompass non-jury decisions and (2) the defendant's presence when the district court rendered its decision as to his guilt would have been useless. Focusing on Fed.R.Crim.P. 43(a), the government argues that whether Canady's presence was required at the return of the verdict in this case turns on whether the word "verdict" in Rule 43(a) refers exclusively to jury verdicts or applies more broadly to bench decisions as well. The government notes that Fed.R.Crim.P. 31(a), which states that the "[verdict] shall be returned by the jury to the judge in open court," indicates that the word "verdict," as used in the Federal Rules of Criminal Procedures, refers exclusively to jury verdicts. In contrast, the government argues, the rules refer to a bench verdict as a "finding." *See* Fed.R.Crim.P. 23(c).

We need not decide whether the word "verdict" in Rule 43(a) refers exclusively to a jury verdict, because the rule requires a defendant's presence at "every stage of the trial," *see, e.g., United States v. Behrens,* 375 U.S. 162, 165, 84 S.Ct. 295, 297, 11 L.Ed.2d 224 (1963). It is plain to us that the moment that the district court announces its decision is a "stage" of the trial, perhaps the most critical one from the defendant's perspective. *See United States v. Huntley,* 535 F.2d 1400, 1404 (5th Cir.1976). We easily conclude that by mailing the verdict, the district court violated Fed.R.Crim.P. 43(a) and therefore erred.

We next address the government's claim that to insist upon the defendant's presence at the return of a non-jury decision would serve no useful purpose. *Accord Rice v. Wood,* 77 F.3d 1138, 1141 (9th Cir.) (en banc) (holding that defendant's absence when jury announced its death sentence was harmless because, in part, defendant had "no active role to play [at sentencing]; he was there only to hear the jury announce its decision."), *cert. denied,* —— U.S. ——, 117 S.Ct. 191, 136 L.Ed.2d 129 (1996). Agreeing with the government, the district court noted that when it is a jury that is returning a verdict, the defendant's presence is useful to correct errors such as a verdict that appears to be non-unanimous, incomplete, or inconsistent. By being present, a defendant can express his concerns to counsel before the jury is dismissed. These concerns, reasoned the district court, are not present with a bench decision since it will always be unanimous and any problems with it can be raised on appeal or in a post-trial motion.

Of course, we recognize that the defendant's right to be present is not absolute, and that, where the defendant's presence would be "useless," no constitutional right is implicated. *Snyder,* 291 U.S. at 106–107, 54 S.Ct. at 332–33; *see Stincer,* 482 U.S. at 745, 107 S.Ct. at 2667; *Rosario,* 111 F.3d at 299. "[T]he exclusion of a defendant from a trial proceeding should be considered in light of the whole record." *Gagnon,* 470 U.S. at 526–27, 105 S.Ct. at 1484. We do not agree, however, that the presence of the defendant when the decision is rendered in a bench trial is useless.

There is a distinctly useful purpose in ensuring that the pronouncement of the defendant's guilt or innocence by the court is both face-to-face and public. It assures that the trial court is "keenly alive to a sense of [its] responsibility and to the importance of [its] functions." *Waller v. Georgia,* 467 U.S. 39, 46, 104 S.Ct. 2210, 2215, 81 L.Ed.2d 31 (1984) (internal quotation marks omitted). When sentence is orally imposed, we have consistently held that it is "critical that the defendant be present." *United States v. Agard,* 77 F.3d 22, 24 (2d Cir.1996) (right of defendant to be present at sentencing is one of "constitutional dimension"); *see United States v. Reyes,* 116 F.3d 67, 70 (2d Cir.1997) (explaining interests vindicated by requirement that sentencing court announce sentence orally in open court); *United States v. Lastra,* 973 F.2d 952, 955 (D.C.Cir.1992); *United States v. Johnson,* 315 F.2d 714, 716 (2d Cir.1963). We see no reason why a defendant's presence is less critical when the court, instead of the jury, renders its decision as to the ultimate issue of whether the

defendant is guilty or innocent. In the jury context, several courts, in rejecting the argument that the defendant's presence is useless, have pointed to the fact that the defendant's mere presence exerts a "psychological influence upon the jury." *Santiago*, 977 F.2d at 523 n. 6; *Larson*, 911 F.2d at 395–96. This is because the jury in deliberating towards a decision knows that it must tell the defendant directly of its decision in the solemnity of the courtroom. We fail to see how the situation is any different when the fact finder is the district judge.

We, therefore, reject the government's contention that the mailing of a verdict following a bench trial is not error.

## 2. *Right to a Public Trial*

■ In addition to violating Canady's right to be present at all critical stages of his trial, the district court's failure to announce its verdict in open court violated Canady's Sixth Amendment right to an open public trial. The government argues that because the district court did not reconvene a proceeding to announce its verdict, the defendant's constitutional right to a public trial is not implicated. At bottom, its contention is that "no proceeding" cannot be a "closed proceeding" in violation of the Constitution. We find that contention to be untenable.

"The right to an open public trial is a shared right of the accused and the public, the common concern being the assurance of fairness." *Press–Enterprise Co. v. Superior Court of Cal.*, 478 U.S. 1, 7, 106 S.Ct. 2735, 2739–40, 92 L.Ed.2d 1 (1986) (*"Press–Enterprise II"*); *see also Press–Enterprise Co. v. Superior Court of Cal.*, 464 U.S. 501, 508, 104 S.Ct. 819, 823, 78 L.Ed.2d 629 (1984) (*"Press–Enterprise I"*) ("[T]he sure knowledge that *anyone* is free to attend gives assurance that established procedures are being followed and that deviations will become known.").

Ours is not the system of criminal administration that left Franz Kafka's Joseph K. wondering "Where was the Judge whom he had never seen? Where was the high Court, to which he had never penetrated?" even as his death sentence was carried out. Franz Kafka, *The Trial* 228–29 (Willa and Edwin Muir, trans., Schocken Books 1992) (1937). The public trial is "a safeguard against any attempt to employ our courts as instruments of persecution. The knowledge that every criminal trial is subject to contemporaneous review in the forum of public opinion is an effective restraint on possible abuse of judicial power." *In re Oliver*, 333 U.S. 257, 270, 68 S.Ct. 499, 506, 92 L.Ed. 682 (1948). The accused is entitled to a public trial so that "the public may see he is fairly dealt with and not unjustly condemned, and that the presence of interested spectators may keep his triers keenly alive to their responsibility and to the importance of their functions." *Id.* at 271 n. 25, 68 S.Ct. at 506 n. 25 (quoting 1 Cooley, *Constitutional Limitations* 647 (8th ed.1927)) (internal quotation marks omitted). The requirement that verdicts be announced in open court "vindicates the judicial system's symbolic interest in maintaining the appearance of justice and its pragmatic interest in giving the finder of fact a final opportunity to change its decision." *Huntley*, 535 F.2d at 1404; *see also Lastra*, 973 F.2d at 955 (public trial right " 'assure[s] the appearance of justice and . . . provide[s] a ceremonial ritual at which society pronounces its judgment.' ") (quoting *United States v. Curtis*, 523 F.2d 1134, 1135 (D.C.Cir.1975)). "People in an open society do not demand infallibility from their institutions, but it is difficult for them to accept what they are prohibited from observing." *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 572, 100 S.Ct. 2814, 2825, 65 L.Ed.2d 973 (1980). In sum, the failure to announce in open court the verdict " 'strikes at the fundamental values of our judicial system and our society as a whole.' " *Vasquez v. Hillery*, 474 U.S. 254, 262, 106 S.Ct. 617, 622, 88 L.Ed.2d 598 (1986) (discussing discrimination on basis of race in jury selection) (quoting *Rose v. Mitchell*, 443 U.S. 545, 556, 99 S.Ct. 2993, 3000, 61 L.Ed.2d 739 (1979)).

The traditional Anglo–American distrust for secret trials has been variously ascribed to the notorious use of this practice by the Spanish Inquisition, to the excesses of the English Court of Star Chamber, and to the French monarchy's abuse of the *lettre de cachet*. . . . One need not wholly

agree with a statement made on the subject by Jeremy Bentham ... to appreciate the fear of secret trials felt by him, his predecessors and contemporaries. Bentham said: "... suppose the proceedings to be completely secret, and the court, on the occasion, to consist of no more than a single judge,—that judge will be at once indolent and arbitrary: how corrupt soever his inclination may be, it will find no check, at any rate no tolerably efficient check, to oppose it. Without publicity, all other checks are insufficient: in comparison of publicity, all other checks are of small account. Recordation, appeal, whatever other institutions might present themselves in the character of checks, would be found to operate rather as cloaks than checks; as cloaks in reality, as checks only in appearance."

*In re Oliver*, 333 U.S. at 268–71, 68 S.Ct. at 505–06 (footnotes omitted) (quoting Jeremy Bentham, 1 *Rationale of Judicial Evidence* 524 (1827)).

■ Thus, a trial court may not circumvent the public trial right by holding no proceedings at all. By mailing its verdict rather than announcing it in open court, a district court undercuts the legitimacy of the criminal justice process. While we do not equate the district court's decision to mail Canady's verdict to the actions of the Court in Kafka's *The Trial,* we hesitate to excuse even such a minor violation of the public trial right. The constitutional violation is perhaps more easily understood in a situation where the accused is mailed a decision acquitting him of all charges after being publicly charged and tried. In such a case, the public pronouncement serves to vindicate the defendant's innocence and, at least to some extent, alleviate the damage to his reputation wrought in the earlier public proceedings. *See generally* Akhil Reed Amar, Foreword, *Sixth Amendment First Principles,* 84 Geo. L.J. 641, 677 (Apr. 1996) (discussing importance of public proclamation of innocence to defendant who "wants only to clear his name in open court, with the bracing sunshine of publicity helping to dry off the mud on his name.").

■ We recognize that the right of a defendant to a public trial is not absolute. In *Waller,* the Supreme Court explained that the defendant's right to a public trial must yield where the government establishes, *inter alia,* an "overriding interest that is likely to be prejudiced" by an open proceeding. 467 U.S. at 48, 104 S.Ct. at 2216. In this case, however, no such showing was made or even attempted. Indeed, the government does not even contend that it had any interest in a closed proceeding. We therefore reject the government's contention that the mailing of a verdict following a bench trial is not error.

### 3. Harmless Error

■ ■ We turn our attention to the question whether the failure of the district court to announce its verdict in open court in the presence of the defendant is subject to harmless error analysis. This is a critical inquiry because, if harmless error analysis is applicable, we have little doubt that the verdict would be the same and that therefore the error would be harmless.

■ While there are some errors to which harmless error analysis does not apply, "they are the exception and not the rule. Accordingly, if the defendant had counsel and was tried by an impartial adjudicator, there is a strong presumption that any other errors that may have occurred are subject to harmless-error analysis." *Rose v. Clark,* 478 U.S. 570, 578–79, 106 S.Ct. 3101, 3106, 92 L.Ed.2d 460 (1986) (citation omitted). Nonetheless, there are "some constitutional rights so basic to a fair trial that their infraction can never be treated as harmless error." *Arizona v. Fulminante,* 499 U.S. 279, 308, 111 S.Ct. 1246, 1264, 113 L.Ed.2d 302 (1991) (plurality opinion). These so-called "structural errors" are "defects in the constitution of the trial mechanism" which affect the "entire conduct of the trial from beginning to end," and include, *inter alia,* "the absence of counsel for a criminal defendant," "the presence on the bench of a judge who is not impartial," and "the right to a public trial." *Id.* at 309–10, 111 S.Ct. at 1264–65.

While the Court in *Fulminante* listed the deprivation of the right to a public trial as a

"structural error," we have recognized that not every violation of that right is free from harmless error review. *See, e.g., Rushen,* 464 U.S. at 118–19, 104 S.Ct. at 455–56 (finding *ex parte* communication between judge and juror to be harmless); *Yarborough v. Keane,* 101 F.3d 894, 898 (2d Cir.1996) (holding that defendant's exclusion from hearing to question witness was harmless because hearing was "extremely brief," "not even a part of the trial proper," and "of little significance"), *cert. denied,* —— U.S. ——, 117 S.Ct. 1706, 137 L.Ed.2d 831 (1997); *cf. Peterson v. Williams,* 85 F.3d 39, 44 (2d Cir.) ("trivial" and "inadvertent" closure of trial during defendant's testimony did not violate public trial guarantee), *cert. denied,* —— U.S. ——, 117 S.Ct. 202, 136 L.Ed.2d 138 (1996). Nonetheless, the rendering of the court's decision, following a criminal bench trial, is qualitatively different from these minor violations of the public trial guarantee.

The announcement of the decision to convict or acquit is neither "of little significance" nor "trivial;" it is the focal point of the entire criminal trial. To exclude the public, the defendant, the prosecution, and defense counsel from such a proceeding—indeed not to have a proceeding at all—affects the integrity and legitimacy of the entire judicial process. *Accord Guzman v. Scully,* 80 F.3d 772, 776 (2d Cir.1996) ("[I]t is well-settled that a defendant whose right to a public trial has been violated need not show that he suffered any prejudice, and the doctrine of harmless error does not apply."). "While the benefits of a public trial are frequently intangible, difficult to prove, or a matter of chance, the Framers plainly thought them nonetheless real." *Waller,* 467 U.S. at 49 & n. 9, 104 S.Ct. at 2217 & n. 9 ("defendant should not be required to prove specific prejudice in order to obtain relief" for violation of public trial right). In view of our long history of public open trials, we hold that the failure to publicly announce in open court the decision following a criminal bench trial is an error of constitutional dimension that affects the framework of the trial itself and is not subject to harmless error review. *But see Huntley,* 535 F.2d at 1404 (pre-*Fulminante* case subjecting trial court's failure to announce verdict publicly to harmless error analysis).

The only question that remains is what relief should be ordered to remedy the constitutional violation. Canady argues that the only remedy is a new trial on the merits. We disagree. In *Waller,* the Supreme Court addressed the question of what remedy was appropriate when a defendant's public trial right has been violated and concluded that "the remedy should be appropriate to the violation." *Waller,* 467 U.S. at 50, 104 S.Ct. at 2217. The Court reasoned that what was required where a suppression hearing was conducted in violation of the Sixth Amendment was remand for a new suppression hearing, finding that "a new trial presumably would be a windfall for the defendant, and not in the public interest." *Id.* We believe that the appropriate remedy in this case is to vacate Canady's conviction, and remand to the district court to announce its decision in open court. In a case such as this, the court's announcement of the outcome of its deliberations, that is, whether the defendant is guilty or not guilty on each of the counts charged, together with the contemporaneous issuance of any written findings and conclusions pursuant to Fed.R.Crim.P. 23(c), fully vindicate the public trial guarantee and the defendant's right to be present at all stages of the trial. Unless the decision is different from that mailed to the parties, there will be no need to resentence the defendant.

We recognize that sending this case back for a public pronouncement of the court's decision may be viewed by some as an unnecessary formality. Yet if the act of public pronouncement in open court is constitutionally required, we can ascertain no other adequate remedy. We add that if we were to hold that the error was not structural and thus subject to harmless error analysis, it would almost always be held to be harmless. In this way, the right would become a right in name only, since its denial would be without consequence.

## CONCLUSION

We have considered Canady's other arguments on appeal and find them to be without merit. For the foregoing reasons, we vacate

365

Canady's conviction and remand for the district court to publicly announce its verdict.